**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MELISSA DAVIS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>VERDE ENERGY USA, INC.,<br><br>Defendant. | No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Melissa Davis ("Plaintiff"), on behalf of herself and all persons similarly situated, by and through her attorneys, allege as follows:

**INTRODUCTION**

1.      Plaintiff brings this action on behalf of herself and a class of all similarly situated customers against Defendant Verde Energy USA, Inc. ("Defendant" or "Verde") in Massachusetts, arising out of Verde's improper practices with regard to billing for "supplying" electricity to residential consumers.

2.      Verde entices residential customers to sign up for its service by offering seemingly low initial rates for electricity.  When the "teaser rate" period expires, however, customers are rolled over into a month-to-month variable rate plan with exorbitant rates.

3.      Verde's "Variable Rate" electricity plan to residential consumers is tied to the market rate in the wholesale power market.  However, contrary to Verde's representations and obligations, Verde consistently and improperly charges an extraordinarily high premium rate for electricity *regardless* of fluctuations in the underlying market price.  Indeed, as set forth below, Verde routinely charges its consumers up to almost **three times** the underlying market rate,

notwithstanding Verde's representations that its variable rates "fluctuate" monthly with wholesale electric prices.  Specifically, even when the market price goes *down,* Verde's rate remains at an inflated level several times higher than the market rate.  Thus, Verde's Variable Rate is not based on market conditions, as promised.

4.      Verde makes additional representations that it offers "low-cost," "competitive" electric rates, and "cost effective" power.  But what Verde does not inform customers is that its Variable Rate is virtually always substantially higher than, and not competitive with, other rates available in the market and is significantly higher than Verde's own Fixed Rates.

5.      Verde's improper scheme of charging inflated electric prices that match *increases* in the underlying market price while failing to pass along corresponding *decreases* is intentionally designed to maximize revenue for Verde.  Consumers, such as Plaintiff and the Class, were deceived into believing that Verde will provide market-based rates when, in reality, Verde sets its prices at significantly above-market rates and Verde's competitors' rates.

6.      Plaintiff and other Verde customers have been injured by Verde's unlawful practices.  Accordingly, Plaintiff, on behalf of herself and the Class, seeks damages, restitution and injunctive relief for Verde's breach of contract (Count I), breach of the implied covenant of good faith and fair dealing (Count II), and unjust enrichment (Count III).

## **PARTIES**

8.      Plaintiff Melissa Davis is a resident and citizen of Lowell, Massachusetts.

9.      Defendant Verde Energy USA, Inc. is a corporation organized under the laws of the State of Delaware whose principal place of business is located at 101 Merit Seven Corporate Park, Norwalk, CT 06851.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction of the claims asserted herein pursuant to 28 U.S.C. § 1332(d)(2)(A) in that the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which members of the putative plaintiff class (the "Class Members" or "Class") are citizens of States different from Defendant.

11.     This Court has general personal jurisdiction over Defendant.  Defendant does business in Massachusetts through continuous, permanent, and substantial activity in Massachusetts.

12.     This Court has specific personal jurisdiction over Defendant because it maintains sufficient contacts in this jurisdiction, including the advertising, marketing, distribution and sale of electricity to Massachusetts consumers.

13.     Venue is proper pursuant to 15 U.S.C. § 80b-14 and 28 U.S.C. § 1391. Defendant regularly transacts and solicits business in this District, and Plaintiff resides in this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A.     Energy Deregulation and the Role of Competitive Electric Suppliers

14.     In the late 1990s and early 2000s, many states moved to deregulate parts of the electricity supply services performed by large public utilities.  Delivery of electricity to a consumer requires both the creation of electricity and the transmission of that electricity from the power plant to the consumer.  The typical pattern was to require the public utilities to divest their power generation assets such as coal, gas and nuclear power plants.  However,

the regulated utilities continued distributing power from these power plants to consumers through transmission lines.

15.     When deregulation occurred, the business of power *supply* was opened to competition and consumers were allowed to select the companies from whom they would purchase their power.   However, states generally set a "standard offer" (also sometimes called a "default rate") available to all customers in each public utility's service area. Massachusetts has both a fixed rate standard offer and a variable rate standard offer.  The fixed rate remains constant, whereas the variable rate fluctuates each month based upon certain factors.

16.     As a result of the deregulation of power supply, several different parties are now involved in the supply of electric power to residential consumers.  Certain companies, such as Dominion, produce electric power ("Generation Companies").   Other companies, such as National Grid in Massachusetts, distribute electricity from Generation Companies to end users ("Distribution Companies").  Although some Generation Companies have sold power directly to consumers, including residential customers, most sell the power on the wholesale market to companies that market to retail customers.  These companies are called Competitive Electric Suppliers ("CESs").  Defendant, Verde, is one such CES.

17.     The market for wholesale power in New England is administered by an independent, not-for-profit corporation formed in accordance with the recommendations of the Federal Energy Regulatory Commission, called ISO New England (for "Independent System Operator").  ISO New England coordinates and directs the generation and flow of electricity throughout the region, ensuring that electric supply exactly meets demand throughout the network.  The wholesale market managed by ISO New England determines whether and when electricity will be made by Generation Companies and the wholesale

prices that will be paid for that electricity through competitive bids. "More than 500 companies participate in these markets, buying and selling between $6-$14 billion of electric power and related products annually."[1] The bid process determines the Generation Company that will make each unit of electricity and the wholesale price each CES will pay to each Generator for each unit of energy delivered to specific locations throughout the region.

18.    CESs, like Verde, play a middleman role: they purchase power directly or indirectly from Generation Companies and sell that electricity to end-user consumers. However, CESs do not *deliver* that electricity to consumers. Rather, Generation Companies deliver the electricity to Distribution Companies, which in turn deliver the electricity to the ultimate consumer. CESs merely buy electricity at the wholesale rate, then sell that power to end-users with a mark-up. Thus, CESs are essentially brokers and traders. They neither make nor deliver electricity, but merely buy electricity from the Generation Companies and re-sell it to end users.

19.    Like other CESs, Verde purchases power on the wholesale market and sells it to consumers. The New England power grid receives power from a variety of power plants and transmits that power throughout New England as needed. Verde buys and resells power purchased from the New England regional electricity market.

20.    Verde's prices do not have to be—and are not in fact—approved by states' regulatory authorities such as the Massachusetts Department of Public Utilities. Rather, Verde and other CESs are free to set their own rates for supplying electricity to consumers. And Verde, like all other suppliers, relies upon the Distribution Companies to deliver the electricity it purchases on the wholesale market to its customers. The Distribution Companies

---

[1] *See* https://www.iso-ne.com/about/what-we-do/three-roles/administering-markets (last accessed April 11, 2019).

charge separately for their services, using rates that must be reviewed and approved by the states' regulatory agencies.

21.    CESs may contract with consumers to supply electricity on either a "Fixed" or "Variable" rate basis.  Under a Fixed contract, the Supplier agrees to supply electricity at a set rate for a certain number of months.

22.    Under a Variable rate contract, the Supplier may vary the rate it charges on a periodic basis (often monthly).

23.    Verde offers various Fixed and Variable rate plans, including contracts that charge a low promotional "teaser" rate which is fixed for a set number of months before automatically rolling into a Variable Rate plan.

**B.    The Failure of Energy Deregulation and Resulting Harm to Consumers**

24.    Almost all states that deregulated their energy markets did so in the mid- to late-1990s.  This wave of deregulation was frantically pushed by then-corporate behemoth Enron.  For example, in December 1996 when energy deregulation was being considered in Connecticut, "the most aggressive proponent" of deregulation, Enron CEO Jeffrey Skilling said:

> Every day we delay [deregulation], we're costing consumers a lot of money . . . .
> It can be done quickly.  The key is to get the legislation done fast.[2]

25.    Changing the industry under this sense of urgency and with inadequate protections against abuse has resulted in consumers in the states that deregulated suffering serious harm.  For example, by 2001, forty-two states started the deregulation process or were considering deregulation.  Today, the number of full or partially deregulated states has dwindled to only seventeen and the District of Columbia.  Even within those states, several have

---

[2] Christopher Keating, Eight Years Later . . . "Deregulation Failed" HARTFORD COURANT, Jan. 21, 2007.

recognized deregulation's potential harm to everyday consumers and now only allow large-scale consumers to shop for their energy supplier.

26.    Responding to shocking energy prices often paid by ordinary consumers, many key players that supported deregulation now regret the role they played.  For example, reflecting on Maryland's failed deregulation experience, a Maryland Senator commented: "Deregulation has failed.  We are not going to give up on re-regulation till it is done."[3]

27.    A Connecticut leader who participated in that state's foray into energy deregulation was similarly regretful:

> Probably six out of the 187 legislators understood it at the time, because it is so incredibly complex . . . .  If somebody says, no, we didn't screw up, then I don't know what world we are living in.  We did.[4]

28.    Deregulation in Massachusetts began in 1997, but the goals of deregulation – "promot[ing] the prosperity and general welfare of its citizens . . . by restructuring the electricity industry in the commonwealth to foster competition and promote reduced electricity rates" (see Ch. 164 of the Acts of 1997, Sec. 1.)  – have not been achieved.

29.    Massachusetts Attorney General, Maura Healey, has expressed serious concerns about the improper practices of Competitive Electric Suppliers, like Verde, who operate in the Commonwealth of Massachusetts.

30.    In March 2018, Attorney General Healey issued a report calling for an end to the competitive electricity supply market for individual residential customers in Massachusetts.[5] According to the report, "Massachusetts electric customers who switched to a competitive

---

[3] David Hill, State Legislators Say Utility Deregulation Has Failed in its Goals, THE WASHINGTON TIMES, May 4, 2011.
[4] Keating, supra note 5.
[5] See Press Release, Office of Attorney General Maura Healey, AG Healey Calls for Shut Down of Individual Residential Competitive Supply Industry to Protect Electric Customers (March 29, 2018), https://www.mass.gov/news/ag-healey-calls-for-shut-down-of-individual-residential-competitive-supply-industry-to-protect.

electric supplier paid $176.8 million more than if they had stayed with their utility company during the two-year period from July 2015 to June 2017."[6]

31.     Healey implicitly recognized the false promises made by competitive electric suppliers like Verde: "Competitive electric suppliers promise big energy savings but are actually burdening customers with hundreds of dollars in extra costs."[7]

32.     Energy deregulation in Massachusetts has been an abject failure.  As discussed in the report, "Massachusetts consumers in the competitive supply market paid **$176.8 million more than they would have paid if they had received electric supply from their electric company during the two-year period from July 2015 to June 2017."[8] (emphasis in the original).  Moreover, the total net consumer loss from participation in the Individual Residential Electric Supply Market compared to the Electric Company's Basic Service was $65.4 million dollars from July 2015 to June 2016.  From July 2016 to June 2017, the total net consumer loss increased to $111.4 million dollars, which leads to a $176.8 million-dollar total net loss in two years."[9]

33.     Concluding that energy deregulation has resulted in considerable consumer harm in Massachusetts, Attorney General Healey "strongly" recommended that the legislature put an end to it:

> I find that the individual residential market for electric supply causes significant net harm to Massachusetts consumers, and I strongly recommend that the Legislature end the individual residential market for electric supply.[10]

---

[6] *See* Report, Massachusetts Attorney General's Office Commonwealth of Massachusetts, An Analysis of the Individual Residential Electric Supply Market in Massachusetts (March 2018), https://www.mass.gov/files/documents/2018/03/29/Comp%20Supply%20Report%20Final%20032918.pdf, at viii.

[7] *See* Press Release, https://www.mass.gov/news/ag-healey-calls-for-shut-down-of-individual-residential-competitive-supply-industry-to-protect.

[8] Report, https://www.mass.gov/files/documents/2018/03/29/Comp%20Supply%20Report%20Final%20032918.pdf at viii.

[9] Id. at Appendix 5A, p. 1.

[10] Id. at 40.

34.     This class action seeks to recover for Massachusetts residents the amounts above and beyond reasonable market rates that Verde deceived Plaintiff and the Class into paying.

**C.     Plaintiff's Experience with Verde's Excessive Rates**

35.     Verde engages in a classic bait and switch pricing scheme.    Verde lures consumers into switching to its electricity supply service by offering teaser rates that are much lower than its regular rates, while leading consumers to believe that the subsequent rates will be less than those offered by their Distribution Company and other CESs in the market.

36.     Plaintiff's experience with Verde is typical.    In June 2015, Plaintiff was solicited by Verde to switch her electricity service from her Distribution Company, National Grid, with the promises that she would save money on her electricity bills if she switched.    Based on these promises, Plaintiff made the switch shortly thereafter.

37.     Plaintiff received in the mail a Welcome Letter from Verde, dated June 16, 2015, in which Verde represented that "We look forward to providing you with 100% renewable energy *at a very competitive rate* . . ." (Emphasis added).    Plaintiff's Welcome Letter is attached hereto as Exhibit "A".

38.     Based on Verde's promises, Plaintiff and other reasonable consumers understand that Verde's variable rates ("Variable Rate") are competitive with other rates in the market.

39.     Furthermore, Plaintiff was provided with a solicitation in the form of a standard "Terms of Service," (the "Agreement") attached hereto as Exhibit "B."    Verde's Agreement makes this express link between its Variable Rate and the underlying wholesale market rate set by ISO New England and charged by Generation Companies, stating the Variable Rate "may fluctuate monthly with market conditions."

40.     As such, reasonable consumers including Plaintiff believe that Verde promises its Variable Rate fluctuates in a manner correlated with the underlying wholesale market rate, and that, although prices would go up when wholesale prices rose, they would also go down when wholesale prices decreased, enabling consumers to take advantage of market lows.

41.     Instead, and contrary to reasonable consumer expectations and the terms of Verde's Agreement, Verde used its Variable Rates as a pure profit center, increasing the rates charged to Plaintiff and class members when wholesale prices rose, but staying at a level almost *three times* the wholesale market rates when the wholesale prices fell.

42.     In addition, Verde's Terms of Service twice refers to its website: www.lowcostpower.com (*See* Exhibit "A").   Plaintiff and any other reasonable consumers conclude that Verde offers power at a low cost relative to market prices.

43.     The home page of the website contains numerous representations, separate and apart from Verde's Terms of Service or any contract with Plaintiff, including representations that Verde provides "competitive pricing" and "competitive electricity rates."  As such, Plaintiff and a reasonable consumer would understand that Verde provides its customers with "low cost power" and "competitive" rates for electricity.

44.     A screenshot of the home page of Verde's website, www.lowcostpower.com, is shown below.  These representations reinforce Verde's promise to provide competitive, low-cost rates to Plaintiff and all Verde customers.



**KEEPING ENERGY CHOICE SIGNIFICANT**

Join other smart consumers who have selected Verde Energy for 100% renewable energy. Make real changes in your everyday cost of living and your impact on the environment starting with your electric bill. Green energy is a smart and sustainable decision that makes sense. We are proud to offer competitive electricity rates for 100% renewable energy. Simply, the right choice for you and the environment, and with our $100 Rebate, it makes sense for your wallet too!

Enter your Zip Code     FIND YOUR BEST RATE

45.     The home page of Verde's website also touts that "[G]REEN ENERGY IS SMART, SUSTAINABLE AND COST-EFFECTIVE."[11]   A reasonable consumer would infer that Verde's pricing would be beneficial, economical, and at a cost that is in line and competitive with other rates in the market.

46.     Thus, Verde misleadingly states that its rates are competitive with rates otherwise available in the market by representing that its rates are "competitive" on its website.

47.     Based on these representations, any reasonable consumer would understand that Verde's Variable Rate would reflect Verde's cost for purchasing electricity at wholesale, and that the Variable Rate would be competitive with the rates offered by Verde's competitors -- the Distribution Company and other CESs in the market.

48.     Based on Verde's representations, Plaintiff decided to switch to Verde for electricity in June 2015.  Plaintiff was initially placed on Verde's fixed, teaser rate plan for six months.  She paid 9.9 cents per kWh during this period.

---

[11] https://www.verdeenenergy.com/energy-supplier/

49.     After the six-month fixed period ended, Plaintiff's account was automatically rolled over to Verde's Variable Rate plan.  Plaintiff began paying Verde's Variable Rate in December 2015.  However, rather than providing low-cost, competitive electric rates that were tied to wholesale market conditions, Verde charged Plaintiff exorbitant monthly rates that were far higher than competitors' rates and did not vary with wholesale market conditions.

50.     Plaintiff paid Verde's Variable Rate until approximately January 2017 after which she ended her Verde service and returned to National Grid.  During the time Plaintiff was on Verde's electricity plan, she was overcharged thousands of dollars.

51.     Verde's breach of its promises and affirmations caused injury to Plaintiff because she believed that by switching to Verde's electricity plan, she was contracting for a competitive, low cost rate that was tied to the wholesale market rate.

52.     Plaintiff overpaid for electricity based on Verde's improper practices.  She would not have enrolled in Verde's plan but for its false representations.  Had Plaintiff known that Verde's rates would be significantly higher than the wholesale market rate or that Verde would not provide her with a competitive, low cost electric rate, she would not have made the decision to switch from National Grid and enroll in Verde's plan.

53.     The chart below sets forth (1) the average wholesale price (in cents per kilowatt hour) of electricity delivered to Massachusetts for each month during the period from January 2016 through January 2017, the time during which Plaintiff was enrolled in Verde's Variable Rate plan, as reported by ISO-New England; (2) the non-promotional Variable Rates Verde charged Plaintiff for those same months as represented by Verde; and (3) the resulting percentage premium that Verde charged consumers compared to the wholesale rate on a per-month basis:

| Billing Period[12] | Average Wholesale Price[13] | Verde Price | Verde Premium ABOVE Wholesale Price |
|---|---|---|---|
| Service End Date | $/kWh | $/kWh | % |
| 1/6/2016 | $0.0829 | $0.179901 | 117% |
| 2/4/2016 | $0.0676 | $0.189898 | 181% |
| 3/7/2016 | $0.0513 | $0.169902 | 231% |
| 4/6/2016 | $0.0647 | $0.159903 | 147% |
| 5/5/2016 | $0.0523 | $0.139898 | 168% |
| 6/6/2016 | $0.0549 | $0.129897 | 137% |
| 7/7/2016 | $0.0699 | $0.119907 | 72% |
| 8/5/2016 | $0.0775 | $0.129894 | 68% |
| 9/6/2016 | $0.0654 | $0.134901 | 106% |
| 10/6/2016 | $0.0538 | $0.144906 | 169% |
| 11/3/2016 | $0.0589 | $0.154897 | 163% |
| 12/6/2016 | $0.1085 | $0.164899 | 52% |
| 1/5/2017 | $0.0973 | $0.164902 | 69% |

54.    There was, accordingly, a huge disparity between the wholesale rates Verde paid for power and the Variable rates that it charged its customers, including Plaintiff and Class Members.

55.    Accordingly, Verde routinely charges Plaintiff and Class Members a Variable Rate for electricity that is as much as ***three times higher*** than the underlying market rate.

56.    For example, as shown in the chart above, just looking at the first two months during which Plaintiff was on the Variable Rate, in January 2016, the average wholesale price was $0.0829 per kilowatt hour but Verde charged $0.179901 per kilowatt hour, a premium of 117% on top of the wholesale price. The following month, February 2016, the wholesale rate dropped to $0.0676 per kWh, but Verde's rate *rose* to $0.189898, resulting in a price that was

---

[12] The first day of the period is approximately thirty days before.

[13] The Average Wholesale Price is compromised of the ISO-NE Total (which includes the ISO-NE WCMA LMP plus other wholesale charges) and includes the cost of renewable energy credits in order for Verde to provide a 100% renewable rate.  Plaintiff is a resident of Lowell, MA, which falls in the Western Central MA (WCMA) Zone.  *See* https://www.iso-ne.com/about/key-stats/maps-and-diagrams/.

181% on top of the wholesale price—which is surprisingly close to three times the wholesale rate.

57.    Moreover, Verde's costs, other than its wholesale cost of power, were relatively fixed and could not have justified the massive increases alleged above.  For example, charges as ancillary and capacity charges and other regulatory costs did not fluctuate to any material extent and, in particular, did not fluctuate to a material extent in relation to wholesale power prices (these additional costs are included in the "average wholesale rate" in the chart shown in paragraph 53 above).  Verde's other material costs were for operations, and included costs, for example, relating to rent, equipment, overhead, employees, etc. were also relatively fixed and could not justify the price variations alleged above.

58.    Also, the cost that Verde pays for renewable energy certificates to provide "100% renewable" or "green" energy are fixed and insignificant in terms of the overall costs Verde incurs to provide retail electricity.  Therefore, these other cost factors cannot explain the drastic increases in Verde's variable rate or the reason its rates are completely disconnected from variation in wholesale costs.  In fact, the average wholesale rate listed above, includes Verde's costs for renewable energy certificates.

59.    Verde's representation to consumers concerning its Variable pricing plan — that the Variable rate is market-based— is patently false.  Although Verde *increases* its Variable rate in response to *rising* wholesale prices, Verde fails to *decrease* its prices in response to a *falling* wholesale market price.  Oftentimes, Verde's rate rises even when the wholesale market rate decreases, and Verde's rates consistently remain significantly higher than the local competitors and the wholesale market rate.  For example, the average wholesale price dropped from $0.0775 in August 2016 to $0.0654 in September 2016 to $0.0538 in October 2016.  However, during the

same time period, Verde's rate increased from $0.129894 to $0.134901 to $0.144906, landing at a premium of *169%* on top of the wholesale price.

60. Notably, Verde charges these exorbitant premiums without adding any value to the consumer whatsoever. As detailed above, Verde neither produces nor transports electricity. It has no role in running or maintaining power plants or power lines; it does not perform hookups or emergency responses. Indeed, Verde does not even handle customer billing: that, too, is handled by the Distribution Company. Essentially, all that Verde does is act as a trader in the transaction. Yet it charges multiple times the amount that the Generation Companies receive for making electricity and that the Distribution Companies receive for transmitting power, maintaining power lines, handling emergency services, and customer billing and calls.

61. The following chart compares Verde's rates to National Grid's rates, which is Plaintiff's Distribution Company. The chart demonstrates that Verde did not provide Plaintiff with either low cost power or a competitive rate—both of which it promised to Plaintiff and other consumers.

| Billing Period[14] | Verde Rate | National Grid Rate[15] | Difference ABOVE National Grid Rate |
|:---:|:---:|:---:|:---:|
| Service End Date | $/kWh | $/kWh | % |
| 1/6/2016 | $0.179901 | $0.16647 | 8% |
| 2/4/2016 | $0.189898 | $0.16604 | 14% |
| 3/7/2016 | $0.169902 | $0.13497 | 26% |
| 4/6/2016 | $0.159903 | $0.11799 | 36% |
| 5/5/2016 | $0.139898 | $0.09073 | 54% |

---

[14] The first day of the period is approximately thirty days before.

[15] This is the National Grid Price to Compare, which can be found here: https://www.mass.gov/service-details/basic-service-information-and-rates. This is the electricity rate that Plaintiff would have paid had she remained with National Grid and not switched over to Verde's electricity plan. The price was calculated accordingly and includes the $0.0150 cost of renewable energy certificates had National Grid provided a 100% renewable electricity.

| | | | |
|---|---|---|---|
| **6/6/2016** | $0.129897 | $0.09601 | 35% |
| **7/7/2016** | $0.119907 | $0.10145 | 18% |
| **8/5/2016** | $0.129894 | $0.09655 | 35% |
| **9/6/2016** | $0.134901 | $0.09152 | 47% |
| **10/6/2016** | $0.144906 | $0.09466 | 53% |
| **11/3/2016** | $0.154897 | $0.09400 | 65% |
| **12/6/2016** | $0.164899 | $0.10684 | 54% |
| **1/5/2017** | $0.164902 | $0.13043 | 26% |

62.     Looking at the chart above, from July 2016 to September 2016, National Grid's rate decreased from $0.10145 to $0.09655 to $0.09152, whereas Verde's rate *rose* from $0.119907 to $0.129894 to $0.134901 in those same months, resulting in a 47% overcharge.

63.     As set forth above, Verde breached its customer contracts as its consumers do not receive a price based on market conditions.  Instead, consumers are charged rates that are substantially higher those of competitors and untethered to market conditions. Verde intentionally fails to disclose this material fact to its customers because no reasonable consumer—including Plaintiff Melissa Davis—who knows the truth about Verde's exorbitant rates would choose Verde as an electric supplier.

64.     Defendant Verde's statements and omissions regarding its electricity rates are materially misleading, as the most important consideration for any reasonable consumer when choosing an energy supplier is price.  No reasonable consumer, including Plaintiff, who knew the truth about Verde's exorbitant rates would choose Verde as an electric supplier, and no reasonable consumer, including Plaintiff, could be expected to uncover the truth until after they have paid Verde's exorbitant rates and had the opportunity to compare them to other rates charged during the same time period and in the same location.

65.     Not surprisingly, Verde's rates are not competitive with those of other CESs either. *See* Exhibit "C" (2016 Retail Power Marketers Sales – Residential, U.S. Energy Information Administration.  In fact, according to U.S. Energy Information Administration's data, in 2016, Verde's rates were higher than 69% of the 39 CESs providing residential electricity services in Massachusetts. *See* id.

66.     Verde knowingly and intentionally made these misleading statements regarding its electric rates so that reasonable consumers like Plaintiff would be enticed by its false and misleading statements and switch their Electric Supplier and/or Generation Company to Verde.

67.     Verde's only product is electricity delivered by Distribution Companies and has the exact same qualities as electricity supplied by other CESs or Generation Companies.  There is nothing to differentiate Verde Energy from other CESs, Distribution Companies, or Generation Companies such that would warrant higher rates, and the potential for a price based on market conditions is the only reason Plaintiff and any reasonable consumer would enter into a contract for electricity with Verde.

68.     Verde knows full well that it charges a rate that is unconscionably high, and the misrepresentations it makes about its Variable Rates being market-based were made for the sole purpose of inducing consumers to sign up for Verde's electricity supply.  Verde reaps outrageous profits to the direct detriment of Massachusetts consumers without regard to the consequences high utility bills cause such consumers.  As such, Verde's actions were actuated by actual malice or accompanied by wanton and willful disregard for consumers' well-being.

69.     Verde's misstatements and omissions caused injury to Plaintiff because she believed that her rate would be based on market conditions when switching from National Grid to Verde's electricity plan.  Plaintiff would not have enrolled in Verde's plan but for its false

misrepresentations.  Had Plaintiff known that the rates she would be charged by Verde would be substantially higher than her local Distribution Company (and not based on market conditions), she would not have made the decision to switch. In fact, Plaintiff and class members substantially overpaid for electricity as a direct result of Verde's misrepresentations, and therefore suffered common injuries, for which damages can be calculated.

70.    Had Verde Energy charged Plaintiff a rate that was actually based on market conditions, Plaintiff would have been charged a substantially lower rate, and she was injured accordingly when she paid her inflated bill.

### D.    Plaintiff Suffered Injury Due To Verde's Improper Business Practices

71.    Plaintiff Melissa Davis paid Verde's Variable rate from January 2016 through January 2017.  During that time, Verde's rates consistently remain significantly higher than the Distribution Company's rates and the wholesale market rate.  For example, in January 2016 -- the first month Plaintiff paid Verde's Variable upon being switched from Verde's Fixed Rate Plan -- she paid a variable rate of 17.99 cents per kwh, **nearly double** the average wholesale rate and **double** Verde's own fixed rate.  And as demonstrated above, although Verde *increases* its Variable Rate in response to *rising* wholesale prices, Verde fails to *decrease* its prices in response to a *falling* wholesale market price.

72.    Verde's conduct, as alleged herein, was improper and it portrayed itself as providing Plaintiff and the Class with an opportunity to purchase low, or lower, energy when, in fact, Verde did the opposite: it charged Plaintiff and the Class more than the underlying wholesale market rates for energy.  Verde further engaged in improper practices by claiming it would provide low-cost power and competitive rates that were competitive with the market.  As evidenced above, Verde's rates were neither low-cost nor competitive.  Verde's rate was

significantly higher than the wholesale market rate, National Grid's rates, and the rates of other CESs in the market.

73.    Plaintiff paid Verde's exorbitant variable electricity rates and thereby suffered damages.  Verde's conduct as alleged above was a substantial factor in causing Plaintiff's losses, which were a reasonably foreseeable result of that conduct.

## CLASS ACTION ALLEGATIONS

74.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following class of similarly situated persons:

> All persons enrolled in a Verde Energy, Inc., variable rate electric plan in connection with a property located within Massachusetts at any time within the applicable statutes of limitations preceding the filing of this action through and including the date of class certification (the "Class").

75.    Plaintiff reserves the right to modify or amend the definition of the proposed Class or to propose sub-classes as might be necessary or appropriate.

76.    Excluded from the Class are Defendant, including any parent, subsidiary, affiliate or person controlled by Defendant; Defendant's officers, directors, agents or employees; the judicial officers assigned to this litigation; and members of their staffs and immediate families.

77.    The proposed Class and meets all requirements for class certification.  The Class satisfies the numerosity standard.  The Class is believed to number in the tens of thousands of persons.  As a result, joinder of all class members in a single action is impracticable.  On information and belief, class members can be identified by Verde and Distribution Company records.

78.    There are questions of fact and law common to the Class which predominate over any questions affecting only individual members.  The questions of law and fact common to the Class arising from Verde's actions include, without limitation, whether Verde:

      a.      breached its contract with regard to its Variable Rate;

      b.      breached its covenant of good faith and fair dealing with regard to its Variable Rate contracts;

      c.      was unjustly enriched through its Variable Rate policies and practices; and

      d.      continues to commit wrongdoing through its Variable Rate policies and practices.

79.     The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness and equity to other available methods for the fair and efficient adjudication of this controversy.

80.     Plaintiff is an adequate representative of the Class because she is a member of the Class and her interests do not conflict with the interests of the members of the class she seeks to represent.  The interests of the members of the Class will be fairly and adequately protected by Plaintiff and her undersigned counsel, who have extensive experience prosecuting complex class action litigation.

81.     Plaintiff's claims are typical of the claims of the Class because they arise out of the same conduct, policies, and practices of Verde with respect to its Variable Rate policies and practices.  Plaintiff has suffered the harm alleged and have no interests antagonistic to the interests of any other putative class member.

82.     Maintenance of this action as a class action is a fair and efficient method for the adjudication of this controversy.  It would be impracticable and undesirable for each class member who suffered harm to bring a separate action.  In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts and could

result in inconsistent adjudications, while a single class action can determine, with judicial economy, the rights of all class members.

83.     Notice can be provided to Class members by using techniques and forms of notice similar to those customarily used in other class actions.

## CLAIMS FOR RELIEF

## COUNT I

### BREACH OF CONTRACT
### (On Behalf of Plaintiff and the Class)

84.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

85.     Plaintiff brings this Count on behalf of herself and the Class.

86.     Plaintiff and the Class entered into a valid contract with Verde for the provision of electricity (the "Agreement").

87.     Pursuant to the Agreement, Verde agreed to charge a Variable Rate for electricity that "may fluctuate monthly with market conditions".

88.     Pursuant to the Agreement, Plaintiff and the Class paid the Variable rates charged by Verde for electricity.

89.     However, Verde failed to perform its obligations under the Agreement because it charged Variable Rates for electricity that were not market-based and instead significantly higher than the wholesale market rate for Electricity.

90.     Plaintiff and the Class were damaged as a result because they were billed and paid for, electricity rates that were substantially higher than they would have been had Verde provided a market-based Variable Rate.

91.     By reason of the foregoing, Verde is liable to Plaintiff and the other members of the Class for the damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus attorneys' fees.

**COUNT II**
**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On Behalf of Plaintiff and the Class)**

92.     Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

93.     Plaintiff brings this Count on behalf of herself and the Class.

94.     All contracts contain an implied covenant of good faith and fair dealing, including Plaintiff's and Class members' contracts with Verde.

95.     Verde's Terms of Service with customers gives Verde discretion concerning the monthly rates charged under Variable rate contracts and any increases or decreases to the rate to reflect the fluctuations and changes in the wholesale power market.

96.     As alleged herein, Verde has used its discretion to bill exorbitant rates that are not tied to the wholesale market and to *increase* the monthly Variable Rate when wholesale market rate goes down.  Verde's rates consistently remain significantly higher than local competitors' rates and the wholesale market rate. Verde failed to disclose that, on a consistent and pre-programmed basis, its Variable Rates are substantially higher than the local competitors' rates and are exorbitant when compared to market rates.  As a result, consumers are billed exorbitant electric rates several times that of the wholesale market rate.

97.     Verde's performance of its discretionary functions under the Terms of Service, as alleged herein to maximize its revenue from Variable Rates, impedes the right of Plaintiff

and other Class Members to receive benefits that they reasonably expected to receive under the contract.

98.     On information and belief, Verde's actions as alleged herein were performed in bad faith, in that the purpose behind the practices and policies alleged herein was to maximize Verde's revenue at the expense of its customers and in contravention of their reasonable expectations as customers of Verde.

99.     Verde has breached the covenant of good faith and fair dealing in the Terms of Service through its Variable Rate policies and practices as alleged herein.

100.    Plaintiff and members of the putative Class have sustained damages as a result of Verde's breaches as alleged herein.

## COUNT III

### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class,
### In the Alternative to Count I)

101.    Plaintiff repeats and realleges the preceding and subsequent paragraphs as though set forth herein.

102.    If the Court finds no contract existed between Plaintiff and Defendant, Plaintiff brings this claim for unjust enrichment on behalf of herself and the Class.

103.    Verde has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein to the detriment of Plaintiff and the Class.

104.    Verde has been enriched by a benefit in the form of payment of exorbitant Variable Rates.

105.    Verde's enrichment was at the expense of Plaintiff and the Class.

106.    It would be unjust to allow Verde to retain the benefit.

107.     Plaintiff and the Class are entitled to disgorgement and restitution of all wrongfully-obtained gains received by Verde as a result of its wrongful conduct alleged herein.

108.     Plaintiff and members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the putative Class, request that this Court enter judgment against Verde and in favor of Plaintiff and award the following relief:

(a)     Certification of the proposed Class, appointment of the Plaintiff as Class representative, and designation of her attorneys as Class Counsel;

(b)     Injunctive relief enjoining Verde from charging exorbitant Variable Rates under its current policies and from engaging in the wrongful, deceptive, unfair, and unconscionable practices alleged herein;

(c)     Damages in an amount to be determined at trial, including actual and punitive damages;

(d)     Disgorgement and restitution of all exorbitant rates paid to Verde by Plaintiff and the putative Class as a result of the wrongs alleged herein;

(e)     Pre- and post- judgment interest at the maximum rate permitted by applicable law;

(f)     Attorneys' fees, costs, and expenses as available under the law;

(g)     Such other and additional relief as the Court may find just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action so triable.

{00196750 }                                   24

April 17, 2019

Respectfully Submitted By:

**BLOCK & LEVITON LLP**

<u>/s/ Jeffrey C. Block</u>
Jeffrey C. Block
Jason M. Leviton
Nathaniel Silver
260 Franklin Street, Suite 1860
Boston, MA 02110
T:  617-398-5600
F:  617-5076020
jeff@blockesq.com
Jason@blockesq.com
Nate@blockesq.com

Jonathan Shub*
Kevin Laukaitis*
**KOHN, SWIFT & GRAF, P.C.**
1600 Market Street, Suite 2500
Philadelphia, PA  19103-7225
T:  215-238-1700
F:  215-238-1968
jshub@kohnswift.com
klaukaitis@kohnswift.com

Daniel K. Bryson*
**Whitfield Bryson & Mason, LLP**
900 W. Morgan Street
Raleigh, NC 27603
T: 919-600-5000
dan@wbmllp.com

Gregory F. Coleman*
**GREG COLEMAN LAW, P.C.**
First Tennessee Plaza
800 S. Gay Street. Suite 1100
Knoxville, TN 37929
T: (865) 247-0090
F: (865) 522-0049
greg@gregcoleman.law

Jason T. Brown*
**JTB LAW GROUP, LLC**
155 2nd Street, Suite 4
Jersey City, NJ 07302

T: (201) 630-0000
F: (855) 582-5297
jtb@jtblawgroup.com

*Pro Hac Vice Application
Forthcoming

*Attorneys for Plaintiff and
the Class*